UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
AT CINCINNATI
CIVIL ACTION NO. 09-543-JGW

KATHERINE MINKS                                                                    PLAINTIFF

V.

AEP RIVER OPERATIONS, LLC                                                 DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Pending are plaintiff's motion for partial summary judgment [Doc. 34] and defendant's motion for partial summary judgment.  Doc. 36.  Because there is a genuine issue of material fact as to whether plaintiff incurred or manifested an injury while employed by defendant on a vessel, both motions for partial summary judgment will be denied.[1]

**I. Factual and Procedural History**

Plaintiff Katherine Minks was employed as a cook by Defendant AEP River Operations, LLC.  On August 3, 2006 plaintiff boarded the vessel the M/V HARRY WADDINGTON ("the Waddington").  On August 27, 2006 plaintiff was working in the ship's galley peeling potatoes when the Waddington collided or bumped against another vessel.  Plaintiff told Michael Morris, captain of the Waddington, that the bump caused her to fall and land on her buttocks.  Doc. 36-3. Plaintiff told James Cagle, pilot of the Waddington, that the collision caused her to lose her balance and bump her wrist against a stove.  Doc. 36-2.  Plaintiff also told Dale Stratton, an engineer on the Waddington, that the collision caused her to bump her arm against the stove. Doc. 36-4.  In her deposition, plaintiff testified that the collision "threw me about six feet across

---

[1]All parties have consented to disposition by the magistrate judge pursuant to 28 U.S.C. §636(c).  Doc. 5.

1

the room into the pantry and I–the way I landed I landed between my–my back and my butt kind of like on the–the back of my back, you know, between my butt." Doc. 36-1, p.7. Assistant Engineer Jared Ferris testified that when he went to the galley after the bump to make sure the ship was not damaged he saw "gallons of milk and broke [sic] dishes on the floor. And [plaintiff] was in there, and, you know, she was complaining about, you know, the boat getting–or hitting so hard, and I helped her clean up the mess." Doc. 34-9, p.2.

At his deposition, Captain Morris answered "[n]o" when asked if plaintiff had told him that she had "hurt anything." Doc. 36-3, p.3. Captain Morris testified that he asked plaintiff later on the date of the collision if she needed to fill out an injury report and plaintiff stated "she didn't think so and she was fine, she didn't want to fill one out." *Id.* at p.6. Plaintiff likewise stated in her deposition that she had declined to fill out an incident form. Doc. 36-1, p.11.

Plaintiff finished her tour of duty and left the Waddington on August 29, 2006–twelve days after the collision. Plaintiff testified that she did not request medical attention for the remainder of her time on the Waddington and that she was able to fulfill all of her job duties. *Id.* at p. 11-12. When she departed the Waddington on August 29, plaintiff checked a box on a departure statement indicating that she had not sustained an injury while on the Waddington. *Id.* at p.25. Plaintiff testified that she did not indicate on the departure statement that she was injured because she "didn't think it was anything serious until a few days" later. *Id.* at p.15.

Plaintiff first sought medical treatment after the fall on September 11, 2006 when she saw Dr. Philip Padgett. *Id.* at p.17. On that date, plaintiff woke up and had trouble moving due to "excruciating pain" in her back and right leg. *Id.* During her September 11 appointment with Dr. Padgett, plaintiff complained of having had pain in her right lower leg for three to four days,

as well as numbness in her toes.  Doc. 36-6, p.3.  Plaintiff told Dr. Padgett the pain was "from injury due to fall on boat."  *Id.*  Dr. Padgett diagnosed plaintiff as suffering from radiculopathy, which he defined as "pain demonstrated in a certain nerve root."  *Id.* at p.5.  Dr. Padgett ordered plaintiff to undergo an MRI and after reviewing the MRI results he diagnosed plaintiff with lumbar disc disease and referred plaintiff to a neurosurgeon, Dr. Glen Anderson.  *Id.* at p.6.  At his deposition, Dr. Padgett was asked:

> Q.  Do you have an opinion within a reasonable degree of medical probability as to the causation of this condition which you diagnosed?  In other words, the ideology, what caused it?
> A.  You know she's–the lady is telling me that she fell and she sustained this numbness in her foot or her toes or whatever.  And so we put the pieces together and yeah, I can say that she had some aggravation from that.

*Id.* at p.7.

Upon further questioning, however, Dr. Padgett testified that he had not been provided with a complete background of the facts surrounding plaintiff's fall.  In fact, Dr. Padgett did not know when plaintiff fell, did not know whether plaintiff had any symptoms immediately after her fall, did not know whether plaintiff actually fell on her back, did not know what plaintiff told the Waddington's captain after the fall, and did not know that plaintiff had denied being injured when she left the Waddington twelve days after the fall.  *Id.* at p. 7-12.  Dr. Padgett also testified that it was "reasonable" that a person could have a herniated disc like plaintiff without having suffered a trauma.  *Id.* at p.11.  Similarly, Dr. Padgett testified that it was "reasonable" that a person who had a trauma causing a herniated disc would have "radicular complaints shortly after the fall."  *Id.* at p.12.  Dr. Padgett ultimately testified somewhat equivocally that plaintiff's injuries "could have happened as a result of this injury or this fall."  *Id.* at p.14.

Neurosurgeon Glen Anderson first saw plaintiff on September 19, 2006.  Doc. 34-3, p.2.

At that meeting, plaintiff told Dr. Anderson that her leg had caused her pain for two weeks and that she had fallen on a boat but had not felt any pain immediately after the fall. *Id.* After plaintiff had an MRI, Dr. Anderson diagnosed her as having a "right L5/S1 disc herniation with radiculopathy." *Id.* Dr. Anderson explained that sometimes patients with plaintiff's condition do not experience problems until a few days or weeks after a traumatic event, and since plaintiff had not had chronic back troubles before he concluded that plaintiff's "symptoms of that disc problem . . . [are] related to her fall." *Id.*

Plaintiff underwent back surgery in October 2006, a "decompression of the right S1 nerve root by partial fasciectomy right L5 sacrum micro-discectomy." *Id.* at p.3. Despite his deposition testimony that plaintiff's disc problem is related to her fall onboard the Waddington, in three separate forms providing space for statements from attending physicians Dr. Anderson checked a box indicating that plaintiff's condition was non-occupational.[2] Doc. 36-9, p. 8-10. Indeed, during his deposition, Dr. Anderson testified that it was possible that plaintiff's spinal condition was a result of the normal aging process. *Id.* at p.6.

When the surgery performed by Dr. Anderson proved unsuccessful at relieving her symptoms, plaintiff sought evaluation by Dr. Henry Eiserloh, an orthopedic spinal surgeon. On November 8, 2010, Dr. Eiserloh performed a second spinal surgery on plaintiff, including placing bone grafts and screws in plaintiff's spine. Doc. 34-5, p.2. Dr. Eiserloh testified at his February 3, 2012 deposition that plaintiff was capable of performing only sedentary or very light employment activities. *Id.* at p.3.

---

[2] Dr. Anderson said that the first form was signed on his behalf by a physician's assistant but that he (Dr. Anderson) signed the other two forms himself. Doc. 36-9, p.5.

Plaintiff filed this action against defendant AEP River Operations, LLC, her former employer, in July 2009.  Doc. 1.  Plaintiff filed her motion for partial summary judgment in March 2012.  Doc. 34.  Plaintiff seeks summary judgment on only her claims for maintenance and cure benefits.[3]  Defendant's motion for summary judgment was also filed in March 2012, and defendant also seeks summary judgment only on plaintiff's claims for maintenance and cure.  Neither party has sought summary judgment on plaintiff's claim for damages under the Jones Act, 46 U.S.C. §30104.  The parties have each responded to their opponent's motion for summary judgment, and the Court has previously ordered that no reply briefs may be filed [Doc. 30], so the motions for summary judgment are ripe.[4]

---

[3]"Maintenance and cure" is defined as "[c]ompensation provided to a sailor who becomes sick or injured while a member of a vessel's crew.  The obligation is broader than what would be covered under workers' compensation, as it applies to illness or injury whether or not arising out of shipboard duties."  Black's Law Dictionary (9th ed. 2009).

[4]On August 17, 2006, when the "bump" giving rise to this action occurred, the Waddington was in the navigable waters of Louisiana.  *See* Vessel Traffic Report at Doc. 34-11.  Until 2008, the Jones Act contained a venue provision providing that venue was proper in the judicial district in which the employer resides or the employer's principal office is located.  *See Lafrance v. Grand River Navigation Co., Inc.*, 2008 WL 5413078, at *1 (E.D.Mich. Dec. 29, 2008).  That venue subsection was repealed in 2008 to make it more clear that a Jones Act suit may be brought wherever the seaman's employer does business.  *Id.* at *2 (quoting H.R.Rep. No. 110-437, §3 (2008)).  Prior to the 2008 amendment, the Supreme Court had already construed the Jones Act to permit venue "to include the definition of corporate residence contained in the general venue statute, 28 U.S.C. §1391."  *Lafrance*, 2008 WL 5413078, at *2 (construing *Pure Oil v. Suarez*, 384 U.S. 202 (1966)).  "Under § 1391(c), a corporation resides 'in any judicial district where it is subject to personal jurisdiction at the time the action is commenced.'"  *Lafrance*, 2008 WL 5413078, at *2 (quoting 28 U.S.C. §1391(c)).

In her complaint, plaintiff alleges venue is proper in this Court because defendant conducts business within this district.  Doc. 1, p.1.  In its answer, defendant denied the jurisdictional allegations in the complaint.  Doc. 8, p.1.  However, at no point before or during the dispositive motion phase has defendant sought relief based upon a claim that this Court is not a proper venue for plaintiff's claims, nor has defendant presented any evidence that it does not do business within this Court's boundaries.  Given the broad venue provisions for Jones Act claims and defendant's lack of specific venue-related arguments, the Court has been presented

5

## II. Analysis

### A. Summary Judgment Standard of Review

Summary judgment is proper only if the facts on file with the court demonstrate not only that no genuine issue of material fact remains to be resolved but also that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party may discharge its burden by "pointing out . . . an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party cannot rest on its pleadings, but must identify specific facts that remain for the finder of fact at trial. *See id.* at 324. Although all inferences are drawn in favor of the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986), the nonmoving party must present significant and probative evidence in support of its complaint. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

The court's function is not to weigh the evidence and determine the truth of the matters asserted, but to determine whether a genuine issue of material fact remains for a fact finder at trial. *Id.* at 249. The inquiry is whether the evidence presents a "sufficient disagreement to require submission [of the case] to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404-07 (6th Cir. 1992). Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion,

---

with nothing to question the propriety of this Court being a proper venue for plaintiff's claims.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404-05. The standard of review does not change when both parties move for summary judgment, nor does the presence of cross-motions mean that summary judgment must be granted. *See, e.g., McKim v. NewMarket Technologies, Inc.*, 370 Fed.Appx. 600, 603 (6th Cir. 2010); *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592-93 (6th Cir. 2001).

### B.  Parameters of Maintenance and Cure

The Sixth Circuit has summarized the ancient admiralty law concepts of maintenance and cure as follows:

> Rather than relying upon the protection of workers' compensation statutes, seamen who suffer illness or injury on the job look to a unique package of remedies. Due to "historical tradition and the realization that seamen are required to endure special perils and hardships," federal common law of the sea accords seamen special relief not available to other workers, including maintenance, cure, and unearned wages. Thomas J. Schoenbaum, *Admiralty and Maritime Laws* § 5-1 (1987). Maintenance refers to a shipowner's obligation to provide a mariner with food and lodging if he becomes injured or falls ill while in service of the ship, while cure alludes to the duty to provide necessary medical care and attention. *See Al- Zawkari v. American S.S. Co.*, 871 F.2d 585, 586 n. 1 (6th Cir.1989). A shipowner is liable to pay maintenance and cure to the point of maximum cure, that is, when the seaman's affliction is cured or declared to be permanent. *See Farrell v. United States*, 336 U.S. 511, 517-19, 69 S.Ct. 707, 710-11, 93 L.Ed. 850 (1949).

*Blainey v. American S.S. Co.*, 990 F.2d 885, 886-87 (6th Cir. 1993) (footnotes omitted).

In order to recover for maintenance and cure, "a plaintiff need show only that (1) he was working as a seaman, (2) he became ill or injured while in the vessel's service, and (3) he lost wages or incurred expenditures relating to the treatment of the illness or injury." *West v. Midland Enterprises, Inc.*, 227 F.3d 613, 616 (6th Cir. 2000). Maintenance and cure "is payable even though the shipowner is not at fault, and regardless of whether the seaman's employment

caused the injury or illness." *Stevens v. McGinnis, Inc.*, 82 F.3d 1353, 1357 (6th Cir. 1996). "A shipowner must pay maintenance and cure for any illness or injury which occurred, was aggravated, or manifested itself while the seaman was in the ship's service." *Id.* (emphasis omitted). However, "[a] seaman whose illness or injury manifests after conclusion of his or her employment with the shipowner is generally not entitled to recover for maintenance and cure absent convincing proof of causal connection between the injury or illness and the seaman's service." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 52 (2nd Cir. 2004) (internal quotation marks omitted). All ambiguities or doubts are to be construed in favor of the seaman. *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962).

**C. Despite the Broad Parameters of Maintenance and Cure, a Material Factual Dispute Exists Regarding Whether Plaintiff's Back Injury Occurred or Manifested Itself While She Was Working on the Waddington**

Defendant's argument is that plaintiff's claim must fail because her back injury did not occur or manifest itself while she was working on the Waddington. Because there is evidence to support both plaintiff's and defendant's positions, summary judgment is inappropriate. *See, e.g., Edmond v. Offshore Specialty Fabricators, Inc.*, 2009 WL 1459701, at *2 (E.D.La. May 26, 2009) ("When there are conflicting diagnoses and prognoses from various physicians, there is a question of fact to be determined by the trier of fact as to a plaintiff's entitlement to maintenance and cure benefits. . . .").

**1. Evidence Favoring Plaintiff**

Plaintiff relies upon Dr. Padgett's deposition testimony. When asked whether he had "an opinion within a reasonable degree of medical probability as to the causation of" plaintiff's back injury, Dr. Padgett responded: "You know she's–the lady is telling me that she fell and she

sustained this numbness in her foot or her toes or whatever. And so we put the pieces together and yeah, I can say that she had some aggravation from that." Doc. 34-2, p.4. Likewise, Dr. Anderson testified at his deposition that plaintiff's disc problem was related to her fall. Doc. 34-3, p.2.

### 2. Evidence Favoring Defendant

Dr. Padgett's causation testimony is undermined by the fact that on cross-examination he testified that he did not know whether plaintiff had any symptoms immediately after the fall; did not know whether plaintiff landed on her low back; did not know what plaintiff told the captain or other crew members after the fall; and did not know plaintiff denied having an injury when she departed the Waddington twelve days after the fall. Doc. 36-6, p.9-10. Dr. Padgett also testified on cross-examination that a degenerative disc disease could occur naturally as part of the aging process and further testified that it would be "reasonable" that a person would have back pain shortly after a fall sufficiently traumatic to induce a herniated disc. *Id.* at p. 12.

Likewise, Dr. Anderson's causation testimony is severely undercut by the fact that he classified plaintiff's injury as non-occupational on multiple forms. Doc. 36-9, p. 8-10. In addition, like Dr. Padgett, Dr. Anderson testified that plaintiff's disc injury could have "happened on its own" as part of the normal aging process. *Id.* at p.6.

Defendant's position is also bolstered by plaintiff's failure to claim an injury upon leaving the Waddington and refusal to fill out an injury form when offered an opportunity to do so by Captain Morris. Indeed, shortly after her fall plaintiff complained to engineer Stratton and pilot Cagle that she had bumped her arm, without complaining of having fallen on her buttocks.

In addition, a report prepared by Dr. Arthur Lee, a physician employed by Wellington

9

Orthopaedic & Sports Medicine, clearly favors defendant. After reviewing plaintiff's medical records and performing an independent medical examination upon plaintiff, Dr. Lee definitively opined that "[i]t is obviously outside of the realm of medical probability that this woman [plaintiff] would have sustained an injury on August 17th of 2006, but yet not have any leg pain for approximately three weeks. . . . I cannot present, within a reasonable degree of medical probability, a causative link between the accident in question and her [plaintiff's] subsequent diagnosis of a herniated disc at L5-S1 given the fact that there was at least two weeks between her reported fall and the development of symptoms. It is not particularly uncommon for a patient to develop symptoms within 24-48 hours, but certainly two weeks is far too long to present a causative relationship between the fall and her subsequent diagnosis." *Id.* at p.10-11.

**3. The Court Cannot Grant Summary Judgment When the Evidence Is Conflicting as to Whether Plaintiff Incurred or Manifested an Injury While Working on the Waddington**

As can be seen from the brief summation of the most relevant evidence, it is clear that there is a genuine issue of material fact regarding whether plaintiff incurred or manifested an injury while she was working on the Waddington. Due to that irreconcilable conflict in the evidence, neither plaintiff nor defendant is entitled to summary judgment. *Edmond*, 2009 WL 1459701, at *2.

**III. Conclusion**

For the foregoing reasons, it is **ORDERED**:

1. Plaintiff's motion for partial summary judgment [Doc. 34] is **denied**; and

2. Defendant's motion for partial summary judgment [Doc. 36] is **denied**; and

3. The previously ordered June 8, 2012 final pretrial conference and June 18, 2012 trial

date shall stand; and

    4.  Pursuant to a discussion during a telephone conference conducted on December 12, 2011, this matter is referred to United States Magistrate Judge Bowman to conduct a settlement conference.  Judge Bowman will contact the parties to determine a mutually agreeable date for the settlement conference.

    This the 5th day of April, 2012.        <u>s/ J. Gregory Wehrman</u>
                                                                          J. Gregory Wehrman
                                                                          United States Magistrate Judge